# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

ENVIRONMENTAL MANUFACTURING
SOLUTIONS, LLC and HEARTLAND
ENERGY GROUP, LTD.,

     **Plaintiffs,**

v.              Case No:   6:18-cv-156-Orl-40KRS

FLUID GROUP, LTD. and CLAY
PURDY,

     **Defendants.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

  This cause came on for consideration without oral argument on the following motion filed

herein:

| | |
|---|---|
| **MOTION:** | **DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT (Doc. No. 21)** |
| **FILED:** | **March 6, 2018** |

## I. BACKGROUND.

  Plaintiffs Environmental Manufacturing Solutions, LLC ("EMS") and Heartland Energy

Group, Ltd. ("HEG") instituted this action in state court on January 4, 2018.   Doc. No. 2.   In their

verified complaint, they alleged that Defendants Fluid Energy Group, Ltd. ("Fluid") and Clay Purdy

tortiously interfered with their business relationships and violated the Florida Deceptive and Unfair

Trade Practices Act ("FDUTPA").   *Id.*   Defendants were served in Calgary, Alberta, Canada, on

January 11, 2018.   Doc. Nos. 35-36.   Defendants removed the case to this Court on January 30,

2018, alleging that the Court could exercise jurisdiction pursuant to 28 U.S.C. § 1332 because the

amount in controversy exceeds $75,000, and the parties are completely diverse.   Doc. No. 1.   After receiving briefing and evidence from the parties, I issued an Order concluding that the parties are completely diverse.   Doc. No. 34.

Plaintiffs filed a verified amended complaint on February 21, 2018.   Doc. No. 14. Defendants then moved to dismiss the amended complaint, arguing that the Court lacks personal jurisdiction over them, service of process was insufficient, and the tortious interference and FDUTPA counts failed to state claims upon which relief can be granted.   Doc. No. 21.[1]   In support of their motion, they submitted a declaration from Purdy, who is the CEO and Chairman of Fluid. Doc. No. 21-1.   Defendants also referred to evidence submitted in support of a previous motion to dismiss, which was denied as moot after Plaintiffs amended their complaint.   Doc. Nos. 8-1 through 8-4.  Plaintiffs filed a response in opposition to the motion, asking that the Court deny the motion or, in the alternative, grant them leave to amend.   Doc. No. 41.   The motion to dismiss has been referred to me for issuance of a report and recommendation, Doc. No. 23, and it is now ripe for decision.

## II.   RELEVANT FACTS.[2]

A.   <u>The Parties and Their Relationship</u>.

EMS is a Florida limited liability company with a principal address in Melbourne, Florida. Doc. No. 14 ¶ 1.   HEG is a Nevada corporation with principal addresses in Grain Valley, Missouri, and Melbourne, Florida.   *Id.* ¶ 2.   EMS and HEG share a common owner, John MacDonald.   *Id.*

---

[1] Throughout this Report and Recommendation, I cite to the original page numbers in this document, not the page numbers assigned when the document was filed on CM/ECF.

[2] The parties do not disagree on any material jurisdictional facts, and, as to the merits, the Court must accept the well-pleaded allegations of the amended complaint as true.   Thus, this statement of facts is drawn from Plaintiffs' amended complaint and the evidence Defendants submitted in support of their motion to dismiss.

¶ 11.[3]   EMS manufactures, distributes, and licenses its hydrochloric, sulfuric, hydrofluoric, and other mineral acid replacement products along with sodium hydroxide, caustic soda, and other base replacement products around the world.   *Id.* ¶ 8.   These patented acid and base replacement products are used to replace the harsher chemicals commonly used in various industries, including construction, aviation, cement, paper, and public works.   *Id.* ¶ 9.   HEG sells similar acid and base replacement products to the fracking industry as an oilfield treatment alternative.   *Id.* ¶ 10.

Fluid is a corporation formed under the laws of Alberta, Canada, with an office in Calgary, Alberta, Canada.   *Id.* ¶ 3.   Clay Purdy is Fluid's CEO and Chairman.   Doc. No. 21-1 ¶ 2.   Purdy is a Canadian citizen and is domiciled in Alberta, Canada.   *Id.* ¶ 3.   Fluid has not made any contact with any customers of HEG or EMS in Florida.   *Id.* ¶ 9.   Fluid has never sold any of its products in Florida.   *Id.* ¶ 8.   Fluid has had contact with United States government agencies regarding EMS and HEG, but such contacts were with offices outside Florida.   *Id.* ¶ 10.

Fluid and HEG were parties to several manufacturing and licensing agreements.   Doc. No. 14 ¶ 12.   Fluid attempted to rescind those agreements by initiating an arbitration with the International Chamber of Commerce ("ICC") on May 28, 2014.   *Id.*   That arbitration was divided into two phases.   *Id.* ¶ 13.   Phase 1 dealt with Fluid's attempt to rescind the agreements, and Phase 2 was intended to deal with HEG's counterclaims related to breach of the agreement and subsequent patent and trademark infringement.   *Id.*   On March 4, 2016, the ICC tribunal issued an award denying Fluid's various theories for rescission and finding no fraud in the inducement, no failure of consideration, no innocent misrepresentation, and no mutual mistake.   *Id.* ¶ 14.   As a result of the Phase 1 award, the parties to the ICC proceeding settled the remaining claims.   *Id.* ¶ 15.   The

---

[3]   I note that Plaintiffs have now submitted evidence establishing that Charlene MacDonald is also a member of EMS.   Doc. No. 32-1 ¶ 6(b).

settlement agreement called for Fluid to pay HEG substantial sums to settle HEG's remaining claims.  *Id.* ¶¶ 16-18.

      B.    <u>Alleged Acts of Harassment</u>.

      Although Fluid performed its obligations under the settlement agreement, it "also continued to harass [HEG] due to FLUID's financial situation and dissatisfaction with the results from the ICC proceeding."  *Id.* ¶ 19.

      1.    EPA Letter.

      First, Fluid wrote a letter to the Environmental Protection Agency ("EPA") and attempted to report HEG to the EPA within weeks of the ICC arbitration ruling.  Doc. No. 14 ¶ 20.  The letter, which was dated April 25, 2016, requested that the EPA initiate a criminal investigation into HEG.  *Id.* ¶ 22; Doc. No. 14-2.  It contains many mischaracterizations and falsehoods.  Doc. No. 14 ¶ 21.  As of the date of the amended complaint, which was filed some 20 months after the letter was sent, HEG was not aware that any such investigation had been initiated.  *Id.* ¶ 23.  HEG's attorney contacted the EPA and was informed that the EPA complaint filed by Fluid and Purdy was closed on May 20, 2016.  *Id.* ¶ 24; Doc. No. 14-3.

      Despite this, Fluid and Purdy sent the letter to customers of HEG and EMS under the guise of a "heads up" regarding the investigation in an attempt to interfere with HEG and EMS's business relationships and contracts.  Doc. No. 14 ¶ 25.  Fluid and Purdy also spoke to HEG and EMS's customers via telephone about the substance of the letter to the EPA and the alleged investigation.  *Id.* ¶ 26.  Fluid and Purdy also sent comments to the websites of HEG and EMS's customers and had multiple telephone conversations with those customers in an attempt to convince or otherwise scare the customers into not doing business with HEG and EMS.  *Id.* ¶ 27.  Other than Brock White and Independent Oilfield Chemicals (discussed below), the amended complaint does not identify

any of the other customers or specify where they are located or where any of these communications took place.

        2.      Brock White.

Brock White is a Wyoming company operating out of Minnesota.   Doc. No. 8-1.   On December 3, 2017, Purdy and Fluid made a submission to the website of Brock White, which is a customer of EMS.   Doc. No. 14 ¶ 28; Doc. No. 14-4.   Fluid and Purdy were aware of the relationship between Brock White and EMS.   Doc. No. 14 ¶ 32.   The message states, "Please have your legal department contact us for legal information on the below company [link to EMS's profile on Brock White's website appears below].   Various USA Government entities would like to speak to your company if you are still working with EMS in Canada or the USA.   We will provide your legal department with the direct contact information."   *Id.* ¶ 28; Doc. No. 14-4.   Purdy also provided a Brock White representative, Darci Smart, with contact information for a U.S. Department of Transportation ("DOT") agent via email.   Doc. No. 14 ¶ 30; Doc. No. 14-5.   Smart's email signature provides an address in British Columbia, Canada, suggesting that she was located in Canada at the time.   Doc. No. 14-5, at 2.   The email states that the agent is "heading up the US Governments position with regards to EMS etc."   *Id.*   Despite this representation, the DOT has confirmed that there is no such investigation taking place.   Doc. No. 14 ¶ 41; Doc. No. 14-8.

When Smart called Purdy, he told Smart that "he was on the other line with a company similar to Brock White in the U.S. whom he was providing similar information to about EMS."   Doc. No. 14 ¶ 31; Doc. No. 14-6.   During a later telephone conversation, Purdy also informed Smart that "he had a relationship with one of the owners of EMS dating back six years and he has made it his personal mission to ensure that companies who represent EMS products are aware of their actions."   Doc. No. 14-6, at 2.   He indicated that there was an "investigation going on into EMS

and their patent infringement as well as some apparent falsification of reports regarding the test results of EMS products." He suggested that Brock White get in touch with its legal team. *Id.*

The actions of Purdy and Fluid have resulted in a loss of millions of dollars of business to EMS. Doc. No. 14 ¶ 34. In 2017, Brock White ordered a total of $2,170,953.81 worth of EMS's products that were distributed all across the United States and Canada. *Id.* Prior to the contact Purdy and Fluid made with Brock White, EMS was strengthening its relationship with Brock White and Brock White's sister companies, including increasing product sales and receiving an invitation to attend Brock White's national sales meeting. *Id.* ¶ 35; Doc. No. 14-7. In addition, Brock White was set to start purchasing products and selling EMS's products via private labeling. Doc. No. 14 ¶ 50. EMS fully expected that Brock White and its sister companies would continue to order EMS's products and accept training from EMS on such products. *Id.* ¶ 40.

Since Fluid and Purdy contacted Brock White, it, along with all of its affiliates, has "pulled all of EMS' products and is no longer selling them unless and until this matter is resolved." Doc. No. 14 ¶¶ 33, 39. Because of Fluid and Purdy's December 2017 contact with Brock White, Brock White asked EMS not to attend its national sales meeting. *Id.* ¶ 36. In addition, none of Brock White's sales managers would make themselves available to meet with EMS's representative at the January 2018 World of Concrete Show in Las Vegas, even though previous plans had been made for such meetings. *Id.* ¶¶ 37-38.

### 3.    Independent Oilfield Chemicals.

Independent Oilfield Chemicals ("IOC") is a Delaware company operating principally out of Colorado. Doc. No. 8-2. It has been a customer of HEG since June 2013. *Id.* ¶ 42. It has ordered a total of $10,497,946.59 from HEG since 2013 on behalf of Liberty Oilfield Services ("Liberty)". *Id.* Liberty is a Delaware company operating principally in Texas. Doc. No. 8-4.

Fluid and Purdy were aware of the business relationship between HEG and IOC. *Id.* ¶ 58. In April 2017, HEG learned that Fluid and Purdy had been making false and disparaging remarks to IOC and Liberty about HEG's Safety Data Sheet ("SDS") claims and testing documentation. *Id.* ¶¶ 43, 59.

On May 11, 2017, representatives from HEG met with representatives from IOC and Liberty. *Id.* ¶ 44. During that meeting, Liberty's Engineering Manager, Ben Poppel, said that Purdy and Fluid had informed IOC and Liberty that there was incorrect rating information on the SDS for an HEG product and that HEG and MacDonald had falsified test results from NASA. *Id.* ¶ 44. MacDonald, who was present at the meeting, reassured IOC and Liberty that the information was correct and suggested that Poppel call OSHA to confirm. *Id.* ¶ 45. Poppel said, "[Y]ou of all people want to go down that road? . . . I know about you . . . I'm going to compliance and I am coming back with proof your wrong and we are filing a lawsuit against you." *Id.* After 20 minutes, Poppel came back to the meeting and admitted that he was wrong and that the rating information on the SDS was correct. *Id.* ¶ 46.

Despite that, due to the false representations of Fluid and Purdy, IOC and Liberty stopped purchasing products from HEG and instead started purchasing products from Fluid. *Id.* Specifically, on or around August 1, 2017, IOC and Liberty stopped ordering products from HEG, which resulted in a loss of millions of dollars of business to HEG as a direct and proximate result of the conduct of Fluid and Purdy. *Id.* ¶ 47. Since 2013, IOC and Liberty had consistently ordered products from HEG, and HEG fully expected those orders to continue through 2017 and into 2018, but for the interference by Fluid and Purdy. *Id.* ¶ 48.

## III.   DISCUSSION.

In their motion, Defendants urge dismissal on four grounds: (1) the Court lacks personal jurisdiction over them; (2) service of process was insufficient; (3) Plaintiffs' tortious interference claims fail to state claims on which relief can be granted; and (4) Plaintiffs' FDUTPA claims fail to state claims upon which relief can be granted.   I address each of these issues separately, below.

### A.   Personal Jurisdiction.

#### 1.   Legal Standard.

For a district court to have personal jurisdiction over a nonresident defendant: (1) the forum state's long-arm statute must provide a basis for exercising jurisdiction; and (2) exercising jurisdiction must comport with the Due Process Clause of the Fourteenth Amendment.   *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013).   The extent of the long-arm statute is governed by Florida law, and federal courts are required to construe it as would the Florida Supreme Court.   *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) (citation omitted).

When the district court does not conduct a discretionary evidentiary hearing on a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the initial burden of pleading sufficient material facts to establish a prima facie case of personal jurisdiction.   *Madara v. Hall*, 916 F. 2d 1510, 1514 (11th Cir. 1990) (citation omitted).   If the plaintiff meets this burden, a "defendant then must raise[ ], through affidavits, documents or testimony, a meritorious challenge to personal jurisdiction."   *Internet Solutions Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009) (internal quotation marks omitted) (quoting *Sculptchair, Inc.*, 94 F.3d at 627).   If a defendant rebuts plaintiff's prima facie case of personal jurisdiction, "the burden shifts to the plaintiff to prove jurisdiction by affidavits, testimony or documents."   *Id.* (citing *Sculptchair*, 94 F.3d at 627).   "The

district court must accept the facts alleged in the complaint as true, to the extent that they are uncontroverted by the defendant's affidavits." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990) (citations omitted). "Where the parties' affidavit and deposition evidence conflict, the district court must construe all reasonable inferences in favor of the plaintiff." *Id.* (citations omitted).

    2.    Applicability of Long-Arm Statute.

I recommend that the Court conclude that Florida's long-arm statute has been satisfied. Plaintiffs contend that Defendants are subject to personal jurisdiction under Fla. Stat. § 48.193(1)(a)(2), which confers specific personal jurisdiction[4] over any nonresident defendant who commits a tortious act within the state (this provision is sometimes referred to as "the tortious acts provision" in this Report and Recommendation).[5]   The parties disagree about both the meaning of the tortious acts provision and its applicability to this case.   I discuss each of these issues, below.

    a.    *Meaning of Fla. Stat. § 48.193(1)(a)(2).*

First, the parties disagree about the meaning of the tortious acts provision.   Plaintiffs contend that Defendants committed torts "within" Florida because they have "injur[ed] EMS and HEG in this state knowing that EMS is located in Florida, HEG has a principal place of business in Florida, and the brunt of the injury would be felt in Florida."   Doc. No. 14 ¶ 6.

---

    [4] "[S]pecific personal jurisdiction authorizes jurisdiction over causes of action arising from or related to the defendant's actions within [the forum state]," whereas "[g]eneral personal jurisdiction is based on a defendant's substantial activity in [the forum state] without regard to where the cause of action arose."   *Louis Vuitton*, 736 F.3d at 1352 (citations omitted).

    [5] The amended complaint also contends that Defendants are subject to personal jurisdiction under Fla. Stat. §§ 48.193(1)(a)(1) (specific jurisdiction based on operating, conducting, engaging in, or carrying on a business in the state) and 48.193(2) (general jurisdiction based on substantial and not isolated activity within the state).   Doc. No. 14 ¶ 6.   Plaintiffs did not address these prongs of the long-arm statute in their response brief, thereby abandoning their reliance on them.   Accordingly, I address only the tortious acts provision of the long-arm statute.

Defendants contend, however, that their actions, as alleged in the amended complaint, do not qualify as committing tortious acts "within" Florida.   They argue that, absent an allegation that the communications at issue in this case occurred in Florida or were directed to Florida companies, EMS cannot establish that the tortious acts provision is satisfied.   Doc. No. 21, at 13-14.   In making this argument, they rely on three decisions from two of Florida's District Courts of Appeal. Those cases found that a tort had not been committed "within" Florida for purposes of the long-arm statute simply because a plaintiff alleged that injury was suffered in Florida; instead, they required that the tortious conduct occur in Florida or be based on communications to Florida.   *Id.* (citing *Metnick & Levy, P.A. v. Seulig*, 123 So. 3d 639 (Fla. 4th Dist. Ct. App. 2013); *Hunt v. Cornerstone Golf, Inc.*, 949 So. 2d 228 (Fla. 4th Dist. Ct. App. 2007); *Telesur v. DOT(SR), Inc.*, 100 So. 3d 1232 (Fla. 2d Dist. Ct. App. 2012)).   Reviewing the allegations of the amended complaint, Defendants conclude that none of their communications were alleged to have occurred in Florida, nor were they directed to Florida companies, and, thus, they are not subject to long-arm jurisdiction under the tortious acts provision.   *Id.*

In response, Plaintiffs do not dispute that the communications at issue took place outside of Florida, and they do not dispute that the communications were made to companies outside of Florida.   Instead, they argue that long-arm jurisdiction is appropriate because they suffered the brunt of the injury in Florida, which is sufficient under Eleventh Circuit precedent.   Doc. No. 41, at 4-8.   In support of this argument, they note that the amended complaint alleges that Defendants committed torts in Florida by "injuring EMS and HEG in this state knowing that EMS is located in Florida, HEG has a principal place of business of Florida, and the brunt of the injury would be felt in Florida."   Doc. No. 14 ¶ 6.

In *Posner v. Essex Insurance Co., Ltd.*, 178 F.3d 1209, 1216-17 (11th Cir. 1999), the U.S. Court of Appeals for the Eleventh Circuit adopted a broad reading of the tortious acts provision of the Florida long-arm statute, concluding that a court may exercise personal jurisdiction over a nonresident defendant who commits a tort outside Florida that causes injury in Florida.   In so holding, the Eleventh Circuit noted that, despite a longstanding conflict among the state district courts of appeal, it had consistently applied a broad construction of the statute:

> Of course, if the Florida Supreme Court were to reject our construction of [the tortious acts provision of the long-arm statute], we would be obliged in future cases to follow that Court's interpretation of the statute.   Absent a contrary decision by that Court, however, we are bound in this case to follow this court's firmly established precedent, which interprets [the tortious acts provision] to apply to defendants committing tortious acts outside the state that cause injury in Florida.

*Id.* at 1216-17 (internal citations omitted).   Since *Posner* was decided, the Eleventh Circuit has continued to apply this broad construction.   *See, e.g.*, *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008).   Moreover, since *Posner*, the Florida Supreme Court has twice declined to decide the issue of whether injury alone satisfies the tortious acts provision of the long-arm statute. *See Wendt v. Horowitz*, 822 So. 2d 1252, 1253 n. 2 (Fla. 2002); *Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1206 n. 6 (Fla. 2010).   Both times, it noted that federal courts addressing the issue had adopted a broad reading.   *Id.*   As of the writing of this Report and Recommendation, I am not aware of a Florida Supreme Court opinion deciding the issue, and Defendants have not cited any such opinion.   Thus, I am bound to follow *Posner* and conclude that, so long as a plaintiff alleges that a defendant committed a tortious act that caused injury in Florida, the tortious acts provision of the long-arm statute is satisfied.   *See VAS Aero Servs., LLC v. Arroyo*, 868 F. Supp. 2d 1374, 1379 (S.D. Fla. 2012) (internal citations and quotation omitted) ("Accordingly, since the Florida Supreme Court is silent regarding how broadly a court should interpret [the tortious acts provision] and the

Florida intermediate appellate courts are split on the issue, I am bound to follow Eleventh Circuit precedent which has consistently applied the broader construction of [the tortious acts provision].").

Defendants relegate their discussion of *Posner* to a footnote, in which they also cite to Eleventh Circuit precedent establishing that, in the absence of an opinion from the Florida Supreme Court, federal courts are bound to "adhere to interpretations of Florida's long-arm statute offered by Florida District Courts of Appeal absent some indication that the Florida Supreme Court would hold otherwise."   Doc. No. 21, at 14 n. 3 (quoting *Louis Vuitton*, 736 F.3d at 1352).   Thus, they urge this Court to follow three cases originating from two of Florida's District Courts of Appeal rather than *Posner*.   This argument ignores *Posner*'s statement that it was compelled to follow the Eleventh Circuit's prior precedent taking the broad interpretation of the long-arm statute until the Florida Supreme Court ruled to the contrary.   It also disregards the *Posner* court's finding that Florida state courts were deeply divided on this issue.   Given that Florida District Courts of Appeal cannot bind each other, *see State v. Hayes*, 333 So. 2d 51, 53 (Fla. 4th Dist. Ct. App. 1976) (citation omitted) ("[A]s between District Courts of Appeal, a sister district's opinion is merely persuasive."), Defendants' citation of three case from two of those courts fails to establish that the conflict observed by *Posner* has been resolved.   Thus, I recommend that the Court follow the *Posner* court's interpretation of the long-arm statute.

b.      Application of Fla. Stat. § 48.193(1)(a)(1).

Applying the *Posner* rule, EMS has adequately alleged that Defendants' tortious actions caused it to suffer injury in Florida.   Specifically, it alleges that it is a Florida limited liability company with its principal address in Florida and that Defendants' tortious actions injured it.   Doc. No. 14 ¶¶ 1, 6, 34, 55.   Defendants' argument that the amended complaint lacks an allegation of actual injury because it alleges that the "brunt of the injury *would* be felt in Florida," Doc. No. 21,

at 14 (citing Doc. No. 14 ¶ 6)), is not well taken.   Focusing on the word "would" out of context ignores the fact that the rest of the sentence focuses on Defendants' knowledge at the time of the torts: "[Defendants] have committed multiple torts in this state . . . by injur[ing] EMS . . . in this state knowing that EMS is located in Florida . . . and the brunt of the injury would be felt in Florida." Doc. No. 14 ¶ 6.   The remainder of the amended complaint clearly alleges that EMS was, in fact, damaged by Defendants' actions.   Accordingly, I recommend that the Court find that Plaintiffs have sufficiently alleged injury in Florida and, thus, that the Court can exercise personal jurisdiction over Defendants under the tortious acts provision of the long-arm statute.   *See Commodores Entm't Corp. v. McClary*, No. 6:14-cv-1335-Orl-37GJK, 2015 WL 1242818, at *2 (M.D. Fla. Mar. 18, 2015) (citation omitted) ("The effects of tortious interference are felt where plaintiffs reside and conduct business.").

HEG presents a somewhat closer case.   As Defendants note, the original complaint alleged that HEG was a Nevada corporation with a "principal address" in Missouri and an office located in Florida.   Doc. No. 2 ¶ 2.   The amended complaint revised that allegation to allege that HEG is a Nevada corporation with "principal addresses" in Missouri and Florida.   Doc. No. 14 ¶ 2.   It also added an allegation that HEG has a "principal place of business" in Florida.   *Id.* ¶ 6.   Nonetheless, when I directed Plaintiffs to provide evidence regarding their citizenship, they responded with an affidavit from John MacDonald averring that HEG's principal place of business (singular) is in Missouri.   Doc. No. 32-1 ¶ 4.   While a corporation may have only one principal place of business for diversity purposes, it may do business in more than one place.   And, while perhaps inartfully worded, the amended complaint alleges that HEG has a "principal address" in Florida and that Defendants knew that "the brunt of the injury would be felt in Florida."   Doc. No. 14 ¶¶ 2, 6. Taken together, these allegations support an inference that HEG does business in Florida and that

Defendants knew that injury would be felt there when they committed the torts described in the amended complaint.   Moreover, Defendants have not submitted any evidence rebutting those claims, so the Court must accept them as true.[6]   *Cable/Home Commc'n Corp.*, 902 F.2d at 855 (citations omitted) ("The district court must accept the facts alleged in the complaint as true, to the extent that they are uncontroverted by the defendant's affidavits.").   Courts have concluded that the type of harm alleged in the amended complaint is felt where a plaintiff conducts business.   *See Commodores Entm't Corp.*, 2015 WL 1242818, at *2 (citation omitted).   Therefore, I recommend that the Court find that the amended complaint adequately alleges that Defendants' actions caused injury to HEG in Florida, thereby making the exercise of jurisdiction under the tortious acts provision of the long-arm statute appropriate.

3.      Due Process.

Although the long-arm statute has been satisfied, I recommend that the Court conclude that exercising personal jurisdiction over Defendants would violate the due process clause of the Fourteenth Amendment to the U.S. Constitution.   In specific personal jurisdiction cases, courts apply the three-part due process test, which examines: (1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice."   *Louis Vuitton*, 736 F. 3d at 1355 (citations omitted).   I address each element, below.

---

[6]  As with EMS, Defendants' argument that the amended complaint lacks an allegation of actual harm to HEG in Florida because it says that harm "would" be felt in Florida is not well taken.   Read as a whole, the amended complaint clearly alleges that HEG did, in fact, suffer the injury as a result of Defendants' actions.

a.      *Claims' relation to Florida contacts.*

First, Plaintiffs' claims—all of which relate to contacts Defendants allegedly with made with Plaintiffs' customers—arise out of Defendants' contacts with Florida.   As explained above, the amended complaint alleges that Defendants contacted Plaintiffs' customers and made false statements to them, thereby causing the customers to cease doing business with Plaintiffs and injuring Plaintiffs in Florida.   This injury in Florida forms the basis of Plaintiffs' tortious interference and FDUTPA claims.    Thus, this element is satisfied.

b.      *Purposeful availment.*

However, Plaintiffs have not shown that Defendants purposefully availed themselves of the privilege of doing business in Florida.   In intentional tort cases, as an alternative to the traditional purposeful availment test[7], a court may apply the "effects test" set forth in *Calder v. Jones*, 465 U.S. 783 (1984), to determine whether purposeful availment has occurred.   *See Louis Vuitton*, 736 F.3d at 1356.   The "effects test" is met when the tort: "(1) [was] intentional; (2) [was] aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state."   *Id.* (quoting *Licciardello*, 544 F.3d at 1285-86).

In *Calder*, the plaintiff, who lived and worked in California, brought a libel suit in California against a reporter and editor of a national newspaper, both of whom resided in Florida.   *Calder*, 465 U.S. at 785-86.   *See also Duncanson v. Wathen*, No. 6:14-cv-704-Orl-40KRS, Doc. No. 123, at 26-27 (M.D. Fla. June 24, 2015), *report and recommendation adopted* by Doc. No. 135 (M.D. Fla. Sept. 25, 2015) (discussing *Calder*).   The suit related to a story that was published in the newspaper, which had its largest circulation in California.   *Id.*   The *Calder* Court concluded that

---

[7] Neither party briefed the traditional purposeful availment test, and Plaintiffs do not contend that it provides a basis for jurisdiction in this case.   Accordingly, I do not discuss it.

both defendants had sufficient "minimum contacts" with California to support the exercise of personal jurisdiction. *Id.* at 790.

The Court noted that, "[i]n judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation." *Id.* at 788 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).   In this case, the allegedly libelous story concerned the activities of a California resident, "impugned the professionalism of an entertainer whose television career was centered in California," and was drawn from California sources, who were contacted by phone. *Id.*   In addition, the brunt of the harm, in terms of the plaintiff's emotional distress and the harm to her professional reputation, was suffered in California. *Id.* at 789.   Accordingly, "California [wa]s the focal point *both* of the story and the harm suffered." *Id.*   The Court determined, therefore, that the publishing of the story was more than "mere untargeted negligence" and that the actions "were expressly aimed at California." *Id.*   It explained:

> [Defendants] knew that the brunt of the injury would be felt by [plaintiff] in the State in which she lives and works and in which the [newspaper] has its largest circulation. Under the circumstances, [defendants] must 'reasonably anticipate being haled into court there' to answer for the truth of the statements made in their article.

*Id.* at 789-90 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Ultimately, the Court concluded that it was proper to exercise personal jurisdiction over the defendants in California "based on the 'effects' of their Florida conduct in California." *Id.* at 789.

The Court further considered the *Calder* effects test in *Walden v. Fiore*, 134 S. Ct. 1115 (2014).   *See also Duncanson*, No. 6:14-cv-704-Orl-40KRS, Doc. No. 123, at 27-28, *report and recommendation adopted* by Doc. No. 135 (discussing *Walden*).   In *Walden*, the plaintiffs were California and Nevada residents.   They sued a Georgia police officer in a Nevada federal court based on actions he took while serving as a deputized Drug Enforcement Administration agent in a Georgia airport.   *Id.* at 1119-20.   Specifically, the officer seized money carried by plaintiffs while

they were travelling to Nevada.  He then moved the cash to a secure location and drafted an affidavit—which the plaintiffs alleged to be false and misleading—purporting to establish probable cause for the seizure.  *Id.* at 1119.  No forfeiture complaint was ever filed, and, eventually, the money was returned to the plaintiffs.  *Id.* at 1120.  In their complaint, the plaintiffs alleged that the officer's actions violated their Fourth Amendment rights.  *Id.*

The district court granted the defendants' motion to dismiss for lack of personal jurisdiction. The U.S. Court of Appeals for the Ninth Circuit reversed.  It assumed that the district court had been correct when it concluded that the search and seizure in Georgia could not support the exercise of jurisdiction in Nevada.  It held, however, that the district court could exercise jurisdiction over "the false probable cause affidavit aspect of the case." *Id.* at 1120 (quoting *Fiore v. Walden*, 688 F.3d 558, 577 (9th Cir. 2011)).  The Ninth Circuit concluded that the defendant "expressly aimed" his submission of the false affidavit at Nevada by submitting the affidavit with knowledge that it would affect persons with a "significant connection" to Nevada.  Because it determined that the delay in returning the funds to the plaintiffs caused them "foreseeable harm" in Nevada and that the exercise of personal jurisdiction over the defendant was otherwise reasonable, it found the district court's exercise of personal jurisdiction to be proper.  *Id.* (summarizing *Fiore*, 688 F.3d at 581-85).

The U.S. Supreme Court granted *certiorari* to determine whether the Nevada court could properly exercise personal jurisdiction over the defendant officer.  *Id.* at 1121.  It began its analysis by noting, "[f]or a State to exercise jurisdiction consistent with due process the defendant's suit-related conduct must create a substantial connection with the forum State." *Id.*  It identified two aspects of the relationship that were relevant to the case.  "First, the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Id.* at 1122 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  This requirement is premised on the notion

that the due process limits on personal jurisdiction are aimed at protecting the liberty interests of non-resident defendants, not the convenience of plaintiffs.   *Id.*   As a result, "however significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.'"   *Id.* (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).   Second, the "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there," and "the plaintiff cannot be the only link between the defendant and the forum."   *Id.*   These same principles apply when the case involves intentional torts.   *Id.* at 1123.

The *Walden* Court added that "the crux" of *Calder* was that "the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff."   *Id.* at 1123-24. It observed that the connection with California in *Calder* was largely a function of the libel tort itself because the reputational injury would not have occurred but for the fact that the article was written for publication in California and was read by a large number of California citizens.   *Id.* at 1124. For that reason, "the 'effects' cause by the defendants' article—*i.e.*, the injury to the plaintiffs' reputation in the estimation of the California public—connected the defendant's conduct to *California*, not just to a plaintiff who lived there."   *Id.* at 1124.

Applying these principles, the *Walden* Court determined that that the defendant Georgia police officer did not have sufficient minimum contacts with Nevada to justify the exercise of personal jurisdiction over him.   *Id.*   None of the officer's conduct occurred in *Nevada*.   *Id.*   He never traveled to, conducted activities within, or sent anything or anyone to Nevada.   *Id.* Accordingly, "when viewed through the proper lens—whether the *defendant's* actions connect him to the *forum*—[the officer] formed no jurisdictionally relevant contacts with Nevada."   *Id.*

The Court also rejected the Ninth Circuit's rationale—namely, that the officer's knowledge

of the plaintiffs' forum connections satisfied the "minimum contacts" inquiry—noting that such an approach "makes those connections 'decisive' in the jurisdictional analysis" and "obscures the reality that none of the petitioner's challenged conduct had anything to do with Nevada itself."   *Id.* at 1125.   It explained, "*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum . . . .   The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."   *Id.*   Because no meaningful contacts existed between the defendant officer and Nevada, the Court determined that the exercise of personal jurisdiction did not satisfy the Due Process Clause. *Id.* at 1126.

Under these standards,[8] Plaintiffs have not established that Defendants have sufficient meaningful contacts with Florida to comport with due process.   In their response to Defendants' motion, Plaintiffs rely entirely on the fact that Defendants allegedly committed intentional torts that they knew would harm Plaintiffs in Florida.   But, as the U.S. Supreme Court made clear in *Walden*, the proper question is not whether Plaintiffs experienced injury in Florida but whether Defendants' conduct connects them to Florida in a meaningful way.   Here, the only connection to Florida is that Defendants allegedly knew that their communications (apparently made from Canada) to Plaintiffs' customers (which are also not located in Florida) would injure Plaintiffs in Florida.   That is not enough under *Walden*.   *See Duncanson*, No. 6:14-cv-704-40KRS, Doc. No. 123, at 29 ("The only contact of [the defendant] with Florida reflected by the record is that, by posting the [infringing image] on its passive calendar, it allegedly injured [the plaintiff].   As *Walden* makes clear, [the

---

[8] Although the Eleventh Circuit discussed *Walden* in connection with a negligence claim in *Aviation One of Florida, Inc. v. Airborne Insurance Consultants (PTY), Ltd.*, ___ F. App'x ___, No. 16-16187, 2018 WL 359998, at *7 (11th Cir. Jan. 11, 2018), it does not appear that it has considered the effect of *Walden* in an intentional tort case.

plaintiff's] status as a Florida resident is insufficient to satisfy the due process inquiry."), *report and recommendation adopted*, Doc. No. 135, at 10 ("There is no explanation for how this event was directed at Florida other than that it simply harmed a Florida resident."). This case is distinguishable from *Calder* because it lacks any other Florida connections beyond the harm Plaintiffs suffered here. Instead, it is more like *Walden*, where the defendant's intent to harm plaintiffs with significant ties to Nevada was the only connection to Nevada.

Plaintiffs' reliance on the post-*Walden* cases of *TSM Technology Management, Inc. v. Benowitz*, No. 6:14-cv-1061-Orl-41TBS, 2015 WL 1311016 (M.D. Fla. Mar. 24, 2015), and *Commodores Entertainment Corp. v. McClary*, 2015 WL 1242818, is unavailing because it does not appear that the parties briefed the applicability of *Walden*. Plaintiffs also assert that *Walden* is distinguishable, but they do not explain how it is distinguishable in any material way from the facts of this case.[9] Instead, they insist that Defendants' intent to harm them and their knowledge that they do business in Florida is sufficient to subject them to personal jurisdiction here:

> It is the intentional conduct which creates the necessary contacts with the forum . . . . Such is the case here—Purdy and Fluid's intentional conduct in interfering [with] Plaintiffs' customers was intended to harm, and did in fact harm, Plaintiffs in Florida, which is where Defendants knew that Plaintiffs . . . do business. Defendants' intentional conduct to damages Plaintiffs . . . directly connects Defendants to Florida.

Doc. No. 41, at 10.

The U.S. Court of Appeals for the Seventh Circuit has rejected precisely that rationale in applying *Walden*:

> Knowing about a potential for harm in a particular state is not the same as acting *in* that state—and it takes the latter to permit personal jurisdiction under state law . . . .

---

[9] Plaintiffs state that "[t]he only contact between the defendant police officer and the forum was the plaintiff's residence there," Doc. No. 41, at 10, but they do not explain how this case differs from *Walden* on that front. While Plaintiffs allude to other business dealings and litigation between Defendants and Plaintiffs elsewhere in their response, *see id.* at 6, 13, none of those contacts relate to the causes of action at issue in this case and, indeed, Plaintiffs did not argue that such contacts should figure into the analysis of the "purposeful availment" prong.

> The district court thought that [the defendant] had set out to injure [the plaintiff], knowing that it is located in Illinois. That's exactly the sort of allegation the Justices deemed inadequate in *Walden*, because "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." The Court added: "These same principles apply when intentional torts are involved." . . . [The plaintiff] tells us that a defendant should be subject to personal jurisdiction in any state at which it "aimed its actions." That contention is incompatible with *Walden*; it is exactly what the court of appeals in *Walden* had held, and not a single Justice accepted the position.

*Ariel Inves., LLC v. Ariel Capital Advisors LLC*, 881 F.3d 520, 522 (7th Cir. 2018) (internal citations omitted). In the absence of guidance from the Eleventh Circuit on the application of *Walden* to intentional tort cases, the reasoning of the Seventh Circuit in *Ariel Investments, LLC*, is persuasive. Accordingly, I recommend that the Court grant Defendants' motion to dismiss for lack of personal jurisdiction because Plaintiffs have not shown that Defendants purposefully availed themselves of the privilege of conducting activities in Florida.

> c. *Traditional notions of fair play and substantial justice.*

If the Court adopts my recommendation that Plaintiffs have not shown purposeful availment, it need not consider whether exercising jurisdiction would offend traditional notions of fair play and substantial justice. If, however, the Court concludes that Defendants have sufficient minimum contacts with the State of Florida, then I recommend that the Court deny Plaintiffs' motion to dismiss for lack of personal jurisdiction because exercising jurisdiction would not offend traditional notions of fair play and substantial justice.

In this analysis, courts consider four factors: (1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the judicial system's interest in resolving the dispute. *Louis Vuitton*, 736 F.3d at 1358 (citing *Licciardello*, 544 F.3d at 1288). A defendant that has purposefully directed its activities at the forum State "must make a 'compelling case' that the exercise of jurisdiction would

violate traditional notions of fair play and substantial justice." *Id.* at 1355 (quoting *Diamond Crystal Brands, Inc. v. Food Movers Itn'l, Inc.*, 593 F.3d 1249, 1267 (11th Cir. 2010)).   I recommend that the Court find that Defendants have not made such a "compelling case."

The totality of Defendants' argument on this point consists of a footnote that reads: "Traditional notions of fair play and justice also do not support the exercise of personal jurisdiction in the present action.   *See, e.g.*, [*Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1221 (11th Cir. 2009)] ('[I]n cases involving international defendants, courts should consider the unique burdens placed upon one who must defend oneself in a foreign legal system.' (quotation marks and citation omitted))."   Doc. No. 21, at 21 n. 8.   Such a conclusory argument does not carry Defendants' burden to make a "compelling case" that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice.   *Oldfield* does not hold that exercising jurisdiction over foreign defendants always offends traditional notions of fair play and substantial justice.   Here, Defendants have not submitted any evidence suggesting that litigating in Florida will burden them.   As to the other factors, Defendants do not dispute that Florida has an interest in adjudicating this dispute and that Plaintiffs have an interest in obtaining convenient and effective relief in their chosen forum of Florida.   *See* Doc. No. 41, at 12-13.   Accordingly, if the Court concludes Plaintiffs have shown purposeful availment, I recommend that it deny Defendants' motion to dismiss for lack of personal jurisdiction.

B.     <u>Insufficient Service of Process</u>.

If the Court grants Defendants' motion to dismiss for lack of personal jurisdiction, it need not consider Plaintiffs' motion to dismiss for insufficient service of process pursuant to Fed. R. Civ.

P. 12(b)(5).[10]   If, however, the Court denies Defendants' motion to dismiss for lack of personal jurisdiction, I recommend that it deny their motion to dismiss for insufficient service of process.

When a defendant moves to dismiss under Rule 12(b)(5), the plaintiff bears the ultimate burden of proving adequate service.   *Blixseth v. Disilvestri*, No. 11-22459-CIV-SEITZ/SIMONTON, 2013 WL 12063940, at *9 (S.D. Fla. Jan. 31, 2013) (citing *Cornwall v. Miami-Dade Cty. Corr. & Rehab. Dep't*, No. 10-23561-CIV-COOKE/TURNOFF, 2011 U.S. Dist. LEXIS 97963, at *4 (S.D. Fla. Aug. 31, 2011)).   If the plaintiff makes a *prima facie* showing of proper service, the burden shifts back to the defendant to bring strong and convincing evidence of insufficient process.   *Id.* (citing *Hollander v. Wolf*, No. 09-80587-CIV/RYSKAMP/VITUNAC, 2009 U.S. Dist. LEXIS 101446, at *8 (S.D. Fla. Oct. 14, 2009)).   "A process server's return of service is presumed to be valid and satisfies a plaintiff's initial prima facie burden absent strong and convincing evidence presented to the contrary."   *Rajbhandari v. U.S. Bank*, 305 F.R.D. 689, 693-94 (S.D. Fla. 2015) (citing *Bodyup Fitness, LLC v. 2080039 Ontario, Inc.*, No. 07-22223-CIV, 2008 WL 516996, at *3-4 (S.D. Fla. Feb. 23, 2008)).[11]

---

[10] Defendants framed their motion as a Rule 12(b)(5) motion and Plaintiffs did not object to that characterization.   Thus, I address it as a Rule 12(b)(5) motion.   I note, however, that, insofar as Defendants object to the process server's failure to place an identification number on the summons, the motion is arguably better characterized as a Rule 12(b)(4) motion to dismiss for inadequate process.   When a defendant objects under Rule 12(b)(4) to the form of process, the motion will generally only be granted when the defect is prejudicial to the defendant.   *Charles Alan Wright*, et al., 5B Federal Practice & Procedure Civil § 1353 & n. 28 (3d ed.) (collecting cases).   Defendants have not alleged that the failure to include the identification number prejudiced them in any way.

[11] I note that Defendants did not brief the standard governing a Rule 12(b)(5) motion to dismiss, except to point out that Plaintiffs bear the ultimate burden of proving proper service.   Moreover, neither party briefed the question of whether the federal Rule 12(b)(5) standard applies where, as here, service was made prior to removal.   Regardless, Florida courts apply substantially the same standard.   Thus, the outcome would be the same even if I considered the motion to dismiss for insufficient service of process under the burdens established by Florida law.   *See Matthews v. U.S. Bank, N.A.*, 197 So. 3d 1140, 1143 (Fla. 4th Dist. Ct. App. 2016) (internal quotations and citations omitted) ("A plaintiff seeking to invoke the court's jurisdiction bears the burden of proper service, which requires a showing that the return of service if facially valid or regular on its face.   If the return is regular on its face, then the service of process is presumed to be valid and the party challenging service has the burden of overcoming that presumption by clear and

Here, service was made before the case was removed to this Court.   *See* Doc. Nos. 35-36 (showing service on January 11, 2018).   Thus, state law determines the sufficiency of service of process.   *Burdock & Assocs., Inc. v. Magnuson*, No. 6:08-cv-415-Orl-22KRS, 2008 WL 3058584, at *3 (M.D. Fla. Aug. 1, 2008) (citation omitted).   As noted above, Defendants were served in Canada.   Under Florida law, "[s]ervice of process on persons outside of the United States 'may be required to conform to the provisions of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters.'"   *Id.* (quoting Fla. Stat. § 48.194(1)).   Article 10(b) of the Hague Convention has been interpreted to mean that service is proper so long as the laws of the state of origin are followed and the state of designation has not objected to them.   *SDS-IC v. Fla. Concentrates Int'l, LLC*, 157 So. 3d 389, 391 (Fla. 2d Dist. Ct. App. 2015) (citation omitted).   Canada is a signatory to the Hague Convention but has not objected to Article 10(b)'s service provision.   *Dimensional Commc'ns, Inc. v. OZ Optics, Ltd.*, 218 F. Supp. 2d 653, 655-56 (D.N.J. 2002).   Thus, service on Defendants is proper if it complied with Florida law.   Section 48.194(1), Florida Statutes, provides, "Except as otherwise provided herein, service of process on persons outside of this state shall be made in the same manner as service within this state by any officer authorized to serve process in the state where the person is served . . . .   An affidavit of the officer shall be filed, stating the time, manner, and place of service."

Defendants argue that service of process is improper here, first, because Plaintiffs have not filed a sworn affidavit of service, as required.   Doc. No. 21, at 22.   This objection is moot because, after Defendants filed their motion, Plaintiffs filed affidavits of service.   Doc. Nos. 35-36.   Those affidavits state the time, manner, and place of service, as required by Fla. Stat. § 48.194(1).   Accordingly, this objection to service of process is not well taken.

---

convincing evidence.").

Second, Defendants argue that service of process was improper because the summonses did not include the process server's identification number.  Doc. No. 21, at 22.  Defendants do not make any argument on this point.  Instead, they simply cite to Fla. Stat. § 48.031(5), which is Florida's general service of process statute and provides that "[a] person serving process shall place, on the first page of at least one of the processes served, the date and time of service and his or her identification number and initials for all service of process."  Defendants do not explain the basis for their attempt to import the requirements of § 48.031(5) into service made outside of Florida under § 48.194 and cite no cases holding that service made outside of Florida is void if the summons does not include the process server's identification number.  Moreover, Florida's Fourth District Court of Appeal rejected precisely this argument in *Matthews v. U.S. Bank, N.A.*, 197 So. 3d at 1144-45.  In that case, defendants were served in New Jersey.  *Id.* at 1145.  They argued that service should be invalidated because the summons did not include an identification number.  Applying a standard similar to the federal Rule 12(b)(5) standard, the court rejected that argument, stating, "[W]e note that process was served in New Jersey.  There is nothing in the record to indicate that New Jersey licenses process servers or that the process server had an identification number . . . .  The burden was on appellants to show by clear and convincing evidence that service was invalid." *Id.*  Here, as in *Matthews*, Defendants have failed to present evidence showing that Canadian process servers have identification numbers.[12]  Moreover, *Matthews* demonstrates that Florida law does not invariably require dismissal because a non-Florida process server fails to include an identification number on the summons.  Accordingly, I recommend that the Court deny Defendants' motion to dismiss for insufficient service of process.

---

[12] Indeed, Plaintiffs' counsel represents that Canadian process servers do not have identification numbers. Doc. No. 41, at 14 n. 2.

If, however, the Court concludes that service of process was not sufficient in this case, then I recommend that the Court quash Plaintiffs' service of process on Defendants but deny Defendants' motion to dismiss for insufficient service of process without prejudice.   Dismissal of a complaint is generally inappropriate when there exists a reasonable prospect that service may yet be obtained. *See F.T.C. v. Centro Natural Corp.*, No. 14-23879-CIV, 2014 WL 7525697, at *6 (S.D. Fla. Dec. 10, 2014) (citation omitted) (denying motion to dismiss as premature where the plaintiff had initiated service in Argentina through the Argentine Central Authority, providing a reasonable prospect that service might yet be obtained); *see also* Charles Alan Wright, et al., 5B *Federal Practice and Procedure Civil* § 1354 & n. 5 (3d ed.) (collecting cases) (noting that the federal courts have broad discretion to dismiss the action or to retain the case but quash service and that service is generally quashed and the action preserved when there is a reasonable prospect that the plaintiff ultimately will be able to make proper service).   Moreover, the 90-day time limit for service does not apply when—as in this case—service is made in a foreign country.  *See* Fed. R. Civ. P. 4(m).   To the extent Plaintiffs' attempt at service was deficient, it was on the most highly technical of grounds. Thus, there is a reasonable prospect that service may yet be obtained.   Accordingly, if the Court concludes that service of process was not sufficient in this case, I recommend that the Court quash Plaintiffs' service, deny Defendants' motion to dismiss for insufficient service of process without prejudice, and allow Plaintiffs another opportunity to serve Defendants.   *See Centro Natural Corp.*, 2014 WL 7525697, at *6; *see also Mitchell v. Volkswagen Grp. of Am., Inc*., 753 F. Supp. 2d 1264, 1269 (N.D. Ga. 2010) (quashing attempted service and denying motion to dismiss).

C.    Failure to State a Claim.[13]

If the Court grants Defendants' motion to dismiss for lack of personal jurisdiction or its motion to dismiss for insufficient service of process, it need not consider Defendants' motions to dismiss the tortious interference and FDUTPA claims under Fed. R. Civ. P. 12(b)(6).   If, however, the Court denies the motion to dismiss for lack of personal jurisdiction and the motion to dismiss for insufficient service of process, I recommend that it deny the motions to dismiss the tortious interference and FDUTPA claims under Rule 12(b)(6), as discussed below.

1.    Legal Standard.

"To survive a motion to dismiss, a [pleading] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   While this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."   *Id.* (quoting *Twombly*, 550 U.S. at 555).   A pleading must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."   *Twombly*, 550 U.S. at 555.   Although a court must accept as true well-pled allegations, it is not bound to accept a legal conclusion couched as a factual allegation. *Iqbal*, 556 U.S. at 678.

---

[13] In a footnote, Plaintiffs invite the Court to consider evidence they submitted in support of their motion for a preliminary injunction when considering their Rule 12(b)(6) arguments.   Doc. No. 41, at 15 n. 3.   The Court cannot consider evidence outside the amended complaint without converting the motion to a motion for summary judgment, Fed. R. Civ. P. 12(d), which I recommend the Court decline to do. Accordingly, I do not consider the extraneous evidence.

2.      Tortious Interference.

Under Florida law, the elements of tortious interference with a business relationship are: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the relationship." *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985). Defendants move to dismiss both EMS's and HEG's tortious interference claims.   I discuss each separately, below.

*a.      EMS's tortious interference claim.*

In Count I of the amended complaint, EMS alleges that Defendants tortiously interfered with its business relationship with Brock White.  Doc. No. 14 ¶¶ 49-55.   In the midst of describing the alleged interference with the Brock White relationship, EMS also alleges, "FLUID and PURDY made false and disparaging statements to Brock White *and other EMS customers* with the intent to cause harm and induce the potential clients and vendors to terminate their relationships with EMS and instead to enter into a relationship with FLUID."   Doc. No. ¶ 54 (emphasis added).   In addition, it alleges, "Due to the false and disparaging statements made by FLUID and PURDY against EMS to Brock White *and other EMS customers*, EMS has lost business and income."   *Id.* ¶ 55 (emphasis added).  Defendants do not dispute that the amended complaint states a claim for tortious interference with respect to the Brock White relationship.  Doc. No. 21, at 23 n. 10. Instead, they contend that EMS has failed to state a claim as to the unnamed "other EMS customers" because EMS has not identified the customers, what they were told, what business relationship they had with EMS, and what business would have been completed absent the alleged interference.  *Id.* at 23.   It is not entirely clear that EMS was attempting to state a claim for interference with its

relationships with these "other customers."   Nonetheless, EMS failed to respond to Defendants' argument that any such claims should be dismissed, thus making the argument unopposed. Therefore, I recommend that the Court dismiss Count I of the amended complaint only to the extent that it purports to plead a claim for tortious interference as to customers other than Brock White.

<em>b.        HEG's tortious interference claim.</em>

In Count II of the amended complaint, HEG alleges that Defendants interfered with its business relationship with IOC.   Doc. No. 14 ¶¶ 56-63.   As to this claim, Defendants do not dispute that the amended complaint adequately alleges that HEG had a business relationship with IOC, that they knew about that relationship, and that they intentionally and unjustifiably interfered with that relationship.   Instead, they focus on the fourth element: causation.   Defendants' argument on this point is conclusory, at best: "Likewise Heartland Energy fails to plead a claim as to [IOC] because it alleges that, that company declined to purchase from Heartland Energy *after* it learned that the purported 'disparaging remarks' were untrue.   No causation is pled on those facts."   Doc. No. 21, at 23.   This argument is opaque and not well-developed, but Defendants appear to be arguing that, since IOC learned that Defendants' disparaging remarks were not true, those disparaging remarks could not have been the cause of IOC's subsequent decision to stop ordering products from HEG.

This argument is not well taken.   The amended complaint alleges that Defendants made disparaging remarks to IOC and liberty about HEG's safety data sheet ("SDS") claims and testing documentation.   Doc. No. 14 ¶ 43.   It alleges that, during a meeting, Liberty's Engineering Manager, Ben Poppel, told HEG that Fluid and Purdy had informed IOC and Liberty that there was incorrect rating information on the SDS and that HEG and MacDonald had falsified test results from NASA.   *Id.* ¶ 44.   It alleges that, after a tense exchange, Poppel returned to the meeting and admitted that the rating information on the SDS sheet was correct.   *Id.* ¶¶ 45-46.   It alleges that,

"[d]espite that, due to FLUID and PURDY's false representations, IOC and Liberty stopped purchasing products from HEG and instead started purchasing products from FLUID." *Id.*   ¶ 46. Finally, it alleges, "On or around August, 2017, IOC and Liberty ceased ordering product from HEG resulting in a loss of millions of dollars' worth of business to HEG as a direct and proximate result of FLUID and PURDY's conduct." *Id.* ¶ 47.

Read in its entirety, the amended complaint plainly alleges that IOC ceased ordering products from HEG because of Defendants' false representations.  The fact that one of Liberty's representatives—Poppel—admitted that the rating information on the SDS sheet was correct does not so undermine the plausibility of HEG's allegation of causation so as to warrant dismissal at this early stage of the litigation.  For example, on the face of the complaint, Poppel admitted that the information on the SDS sheet was correct, but he did not admit that he knew that Defendants' other misrepresentation—the statement that HEG had falsified test results from NASA—was false.  *See* Doc. No. 14 ¶¶ 44, 46.  And it is plausible that disparaging remarks about a vendor could lead a customer to cease doing business with the vendor, even if it knew that some of the disparaging remarks were false.  Accordingly, I recommend that the Court deny Defendants' motion to dismiss HEG's claim that Defendants tortiously interfered with its relationship with IOC.

As with Count I, Count II of the amended complaint also mentions that Defendants "made false and disparaging statements to IOC, Liberty, *and other HEG customers* with the intent to cause harm and induce the potential clients and vendors to terminate their relationships with HEG and instead to enter a relationship with FLUID." *Id.* ¶ 62 (emphasis added).  And it alleges, "Due to the false and disparaging statements made by FLUID and PURDY against HEG to IOC, Liberty, *and other HEG customers*, HEG has lost business and income." *Id.* ¶ 63 (emphasis added).  Again, Defendants move to dismiss the claims insofar as they relate to the "other customers."  Doc. No.

21, at 23.   As with Count I, it is not entirely clear that HEG was attempting to state a claim as to business relationships beyond its relationship with IOC.   Nonetheless, it failed to respond to HEG's argument, thereby making this aspect of the motion unopposed.   Accordingly, I recommend that the Court dismiss Count II to the extent it purports to state a claim for tortious interference as to customers other than IOC.

<em>c.   Leave to amend Counts I and II.</em>

Plaintiffs have requested that, if the Court finds that they have "not met [their] burden as to certain claims," they be granted leave to amend pursuant to Fed. R. Civ. P. 15(a)(2).   Doc. No. 41, at 18.   Here, I have recommended that the Court dismiss Counts I and II to the extent that they purport to state claims for tortious interference as to customers other than Brock White and IOC. The Court may also not adopt my recommendation and decide that it is appropriate to dismiss Counts I and II in their entirety.   Leave to amend should be freely granted, especially at this early stage of the litigation.   There is no indication that leave to amend would be futile or prejudicial to Defendants.   Moreover, the Court's ruling on this motion represents its first opportunity to address the alleged defects in the amended complaint.   Accordingly, I recommend that the Court grant Plaintiffs leave to amend Counts I and II of their amended complaint to address any deficiencies identified by the Court in its analysis of Defendants' Rule 12(b)(6) arguments.

3.   FDUTPA.

In Count III, Plaintiffs assert a claim for violation of FDUTPA.   The purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."   Fla. Stat. § 501.202(2).   FDUTPA should be construed liberally to promote this policy.   *Bailey v. St. Louis*, 196 So. 3d 375, 382 (Fla. 2d Dist. Ct. App.

2016).   Defendants allege that Plaintiffs' FDUTPA claim should be dismissed because Plaintiffs lack standing, they fail to allege that any consumers were aggrieved, and they fail to allege causation with respect to the business relationship with IOC and the unnamed "other customers."[14]   Plaintiffs oppose the motion and, in the alternative, request leave to amend.   I address these arguments, below.

*a.*      *Standing.*

Defendants first argue that Plaintiffs' FDUTPA claims are due to be dismissed because Plaintiffs are not consumers and, therefore, lack standing under FDUTPA.   This argument is foreclosed by governing law.   Prior to 2001, Fla. Stat. § 501.211(2) limited the class of plaintiffs who could file suit for money damages to "*consumers* who have suffered a loss as a result of a violation of [FDUTPA]."   *Bailey*, 196 So. 3d at 382.   However, in 2001, the Florida legislature amended the statute to replace the word "consumer" with the word "person."   *Id.*; *see also* Fla. Stat. 501.211(2).

The Florida Supreme Court has not addressed the effect of the 2001 amendment on the question of who has standing to seek monetary damages for a FDUTPA violation.   However, three of Florida's District Courts of Appeal have considered the issue, and they all have concluded that, in amending the statute, the legislature was attempting to give non-consumers standing under FDUTPA.   *See, e.g.*, *Bailey*, 196 So. 3d at 383 (finding that competitor has standing to sue for damages under FDUTPA); *Off Lease Only, Inc. v. LeJeune Auto Wholesale, Inc.*, 187 So. 3d 868, 869 n. 2 (Fla. 3d Dist. Ct. App. 2016); *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm*

---

[14] Defendants actually phrase this argument as "the Amended Complaint insufficiently alleges causation as to Heartland Energy and all but one of the customers of Environmental Manufacturing.   The FDUTPA claim merely adopts the factual allegations in the other counts, so it suffers from the same pleading defects."   Doc. No. 21, at 25 (internal citation omitted).   This conclusory argument is not particularly clear, but it appears that Defendants are attempting to restate the same arguments they made as to Plaintiffs' tortious interference claims.

*Beach Cty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th Dist. Ct. App. 2015).   In *Caribbean Cruise Line*,

Florida's Fourth District Court of Appeal explained the rationale of this conclusion as follows:

> In [*Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1372-73 (S.D. Fla. 2010)], the court aligned itself with the group of [federal] cases [decided after the 2001 amendment] which held that an entity was not required to be a consumer in order to have standing to bring a FDUTPA claim.   This was because the court agreed that the 2001 amendment served to broaden the reach of the statute so that more than just consumers could avail themselves of the protection of this statute.   We agree with the reasoning in *Kelly*.   It is a well-established presumption that the legislature intends to change the law when it amends a statute.   Therefore, the legislative change regarding the claimant being able to recover under FDUTPA from a "consumer" to a "person" must be afforded significant meaning.   This change indicates that the legislature no longer intended FDUTPA to apply to only consumers, but to other entities able to prove the remaining elements of the claim as well.

*Id.* at 169 (internal citations and quotations omitted).

Absent a clear direction from the Florida Supreme Court on an issue, this Court is bound to

follow decisions of the state's intermediate appellate courts unless there is some persuasive

indication that the Florida Supreme Court would decide the issue differently.   *Nunez v Geico Gen.

Ins. Co.*, 685 F.3d 1205, 1210 (11th Cir. 2012) (citation omitted).   And, even if the Court were not

bound by these opinions, I find their rationale persuasive.

Defendants' citation to *N.G.L. Travel Associates v. Celebrity Cruises, Inc.*, 764 So. 2d 672,

674 (Fla. 3d Dist. Ct. App. 2000), is unavailing because that decision pre-dates the 2001 amendment

to the statute.   Defendants also cite a number of federal cases decided after the 2001 amendment

that concluded that only consumers could bring a monetary damages under FDUTPA.   Doc. No.

21, at 24.   These decisions were made without the benefit of the Florida District Courts of Appeal

in *Bailey*, *Off Lease Only*, and *Caribbean Cruise Line*.   Moreover, a federal court's disagreement

with a state court decision is not a persuasive indication that the Florida Supreme Court would

decide the issue differently than a state intermediate appellate court.   *Glass v. Captain Katanna's,

Inc.*, 950 F. Supp. 2d 1235, 1238 n. 3 (M.D. Fla. 2013) (quoting *McMahan v. Toto*, 311 F.3d 1077,

1080 (11th Cir. 2002)).   Accordingly, I recommend that the Court follow *Bailey*, *Off Lease Only*, and *Caribbean Cruise Line* and conclude that Plaintiffs' status as non-consumers does not bar them from making a FDUTPA claim.

*b.*      *Consumer injury.*

Although competitors may bring FDUTPA claims for damages, the 2001 amendment did not wholly eliminate the need for consumer injury.   To state a FDUTPA claim, a plaintiff must allege: (1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages.   *Dolphin LLC v. WCI Communities, Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013) (citation omitted); Fla. Stat. 501.204(1).   The presiding District Judge in this case has previously observed that, regardless of the type of relief sought, a FDUTPA plaintiff must allege facts showing that the defendant committed a deceptive act or engaged in an unfair practice in order to state a claim.   *Hill Dermaceuticals, Inc. v. Anthem, Inc.*, 228 F. Supp. 3d 1292, 1302 (M.D. Fla. 2017) (citing *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d Dist. Ct. App. 2006)).   "A deceptive act is one which 'is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'" *Id.* (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)). And "an unfair practice is one which causes substantial injury to a consumer which the consumer could not have reasonably avoided and which is not outweighed by the countervailing benefits to the consumer or to the competition."   *Id.* (citing *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1096 (Fla. 3d Dist. Ct. App. 2014)).   Finally, "an act is not deceptive and an act is not unfair unless a consumer was actually aggrieved by the practice."   *Id.* (citing *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1317 (M.D. Fla. 2000)).

Defendants argue (in conclusory fashion) that "[Plaintiffs'] conclusory allegations fail to allege any consumers were aggrieved and thus have not established the existence of any actionable

deceptive acts or unfair trade practices." Doc. No. 21, at 25.   But, as discussed above, the amended complaint clearly alleges that Defendants made specific false representations to Brock White and IOC.   Doc. No. 14 ¶¶ 20-24, 28-31, 41, 43-46, 52, 62, 67.   It also clearly alleges that Brock White and IOC stopped doing business with IOC based on Defendants' misrepresentations and, instead, began doing business with Fluid.   Doc. No. ¶¶ 33, 36-39, 46-47.   That is, the amended complaint adequately alleges that Brock White and IOC were deceived by Defendants' communications and took action based upon them.   Although the amended complaint does not formulaically recite the "likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment" language, it does allege that Defendants made serious—and untrue—allegations about Plaintiffs, including claiming that they were the subject of federal investigations and that they falsified test results.   I conclude that such allegations plausibly support such an inference that the alleged misrepresentations would have been likely to mislead a consumer acting reasonably in the circumstances to the consumer's detriment.   Accordingly, the amended complaint adequately alleges Defendants committed a deceptive act, as required to meet the first element of a FDUTPA claim.

The *Hill Dermaceuticals* case—relied upon by Defendants—is distinguishable.   In that case, the complaint alleged that the defendant's actions "*may* lead physicians, pharmacists, and residents of the State of Florida to believe [the product] lacks scientific evidence to prove its demonstrated safety benefits over other . . . medications."   *Id.*   By way of contrast, the deception to consumers in this case is not hypothetical.   Instead, the amended complaint alleges that Defendants actually made misrepresentations to Brock White and IOC and that they actually stopped doing business with Plaintiffs based on those misrepresentations.   Defendants do not explain why such allegations are insufficient to establish that Defendants' alleged misrepresentations were

"likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."   Accordingly, I recommend that the Court conclude that Plaintiffs have adequately alleged a deceptive act, as required to meet the first element of a FDUTPA claim.

### c.    Causation.

Finally, Defendants contend that Plaintiffs have not adequately alleged causation.   Again, their argument is conclusory: "[A]s stated above, the Amended Complaint insufficiently alleges causation as to HEG and all but one of the customers of Environmental Manufacturing.   The FDUTPA claim merely adopts the factual allegations in the other counts, so it suffers from the same pleading defects."   Doc. No. 21, at 25.   Although this argument is not entirely clear, it appears that Defendants are attempting to re-state the arguments they made with respect to the tortious interference claims.   Thus, I assume that "one of the customers of Environmental Manufacturing" refers to Brock White and that Defendants do not contest that Plaintiffs have adequately alleged causation insofar as the FDUTPA count implicates Brock White.   I also assume that Defendants are arguing that: (1) the amended complaint does not adequately allege causation as to IOC because Poppel admitted that he knew one of the misrepresentations was untrue; and (2) the amended complaint does not adequately allege causation as to the unnamed "other customers" mentioned in the complaint.

As to the first argument, Defendants' causation argument fails for the same reason it failed with respect to the tortious interference claim—Poppel's statement that he knew one of the misrepresentations was untrue does not, when read in conjunction with the rest of the amended complaint, undermine Plaintiffs' allegation that Defendants' misrepresentations caused IOC to stop doing business with HEG, thereby injuring HEG.   And, as for the second argument, again, it is not entirely clear that Count III of the amended complaint is intended to state a claim for

misrepresentations to customers other than Brock White and IOC.   Nonetheless, Plaintiffs did not respond to Defendants' arguments regarding the "other customers," thereby leaving them unopposed.   Accordingly, I recommend that the Court grant Defendants' motion to dismiss Count III only insofar as it purports to be based on communications to unnamed "other customers" and deny the motion in all other respects.

<em>d.        Leave to amend Count III.</em>

As set forth above with respect to Counts I and II, if the Court adopts my recommendation to dismiss Count III in part, or if it concludes that Count III is due to be dismissed in its entirety, I recommend that the Court allow Plaintiffs leave to file a second amended complaint addressing any deficiencies the Court identifies.

## IV.   RECOMMENDATIONS.

Accordingly, I **RESPECTFULLY RECOMMEND** that the Court:

1.   **GRANT** Defendants' motion to dismiss for lack of personal jurisdiction;

2.   **DISMISS** this case;

3.   **DIRECT** the Clerk to terminate all pending motions (including Defendants' alternative motions to dismiss for insufficient service of process and for failure to state a claim); and,

4.    **DIRECT** the Clerk to close the file.

If, however, the Court concludes that Plaintiffs have shown purposeful availment, then I **RESPECTFULLY RECOMMEND** that the Court:

1.   **DENY** Defendants' motion to dismiss for lack of personal jurisdiction because exercising jurisdiction does not offend traditional notions of fair play and substantial justice;

2.  **DENY** Defendants' motion to dismiss for insufficient service of process;

3.  **GRANT in part** Defendants' motion to dismiss Count I of the amended complaint to the extent that it purports to state a claim for tortious interference as to customers other than Brock White, but **DENY** that motion in all other respects;

4.  **GRANT in part** Defendants' motion to dismiss Count II of the amended complaint to the extent that it purports to state a claim for tortious interference as to customers other than IOC, but **DENY** that motion in all other respects;

5.  **GRANT** Defendants' motion to dismiss Count III of the amended complaint to the extent that it purports to state a claim for violation of FDUTPA as to customers other than Brock White and IOC, but **DENY** that motion in all other respects; and,

6.  **GRANT** Plaintiffs' request for leave to file a second amended complaint to address any deficiencies identified by the Court within a time set by the Court.

If the Court concludes that service of process was not sufficient in this case, then I **RESPECTFULLY RECOMMEND** that the Court **DENY without prejudice** Defendants' motion to dismiss for insufficient service of process, **QUASH** Plaintiffs' service of process on Defendants, and **ALLOW** Plaintiffs another opportunity to serve Defendants.

## <u>NOTICE TO PARTIES</u>

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written

objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on May 9, 2018.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy